# Turner's Administrator *v.* Patton.

*Contest between Administrator and Creditor of Insolvent Estate.*

1. *Judicial notice of termination of late civil war, or Rebellion, and restoration of United States mails.* — The courts will take judicial notice of the fact, that the late civil war (or Rebellion) in the United States was terminated prior to the 1st day of June, 1865; and that the United States mails were reëstablished between Huntsville, Alabama, and New Orleans, Louisiana, prior to the 18th December, 1865.

2. *Foreign bill of exchange; protest, and notice to indorser.* — To charge an in-

[Turner's Administrator *v.* Patton.]

dorser of a foreign bill of exchange, drawn in Huntsville, Alabama, in May, 1860, or 1861, and payable in New Orleans, Louisiana, twelve or thirteen months after date, protest and notice thereof on the 20th February, 1866, is not sufficient.

APPEAL from the Probate Court of Madison.

In the matter of the estate of Daniel B. Turner, deceased, which was regularly declared insolvent on the 28th July, 1869; and against which, on the 4th February, 1870, Mrs. Martha L. Patton, the appellee, filed two claims, which are thus described in the bill of exceptions: " One, founded on a bill of exchange for $11,614 $\frac{90}{100}$; dated May 29, 1861, payable twelve months after date, to said Daniel B. Turner, and indorsed by him and Joseph C. Bradley, drawn in Huntsville, Alabama, by Fleming Jordan, on Bradley, Wilson & Co., New Orleans, La.; the other, a bill of exchange for $3,890 $\frac{65}{100}$, drawn in Huntsville, Alabama, by Jordan & Moore, on Bradley, Wilson & Co., New Orleans, La., dated May 4th, 1860, payable thirteen months after date, to Joseph C. Bradley, and indorsed by him and said Daniel B. Turner." On the hearing before the Probate Court, the allowance of these claims was objected to by the executor of the last will and testament of Samuel Townsend, deceased, who was a creditor of said Turner's estate, and who, within the time prescribed by law, filed the following objections to the allowance of said claims : " 1. That said Daniel B. Turner was discharged from liability on said bills of exchange, by want of diligence on the part of the holder to obtain payment of the drawees, and to notify said Turner of the failure." " 2. That said bills of exchange were not presented to the drawees thereof, and payment thereof demanded, at their maturity." " 3. That said bills of exchange were not protested, and notice thereof given to said Daniel B. Turner, in due time." " 4. That said Daniel B. Turner never became bound in law to pay said bills of exchange, or any part thereof."

" An issue was made up," so the bill of exceptions recites, " between the said claimant and the said contesting creditor, in the name of the administrator of said Turner, as to the correctness of each of said claims; the said claimant averring their correctness, and the said contesting creditor, in the name of the administrator, denying their correctness; and the filing of formal complaint and pleas being waived by the parties. It was admitted, that said bills of exchange were protested in due form in New Orleans, on the 20th day of February, 1866; and that notice of said protest was, on the same day, duly sent by mail to said Daniel B. Turner, at Huntsville, Alabama, which was his post-office; and that there was no other protest, or notice to said Turner; and that the only objection to the allowance of said claims was, that said protest and notice of

the 20th February, 1866, were not sufficient to charge said Turner as indorser of said bills of exchange. Said issues being tried by the court, without a jury, and this being all the evidence, the court decided said issues in favor of the claimant, and allowed each of said claims; to which the said contesting creditor, in the name of the administrator, excepted."

The allowance of these claims, and the overruling of the objections filed to their allowance, are now assigned as error.

CABANISS & WARD, for the appellant. — The existence of the war suspended all commercial intercourse between citizens of the insurrectionary states; but only during its continuance, and for a reasonable time after its termination. When the first bill matured, Huntsville and New Orleans were both within the rebel lines; when the second was drawn, both of those places were within the rebel lines, and both were within the federal lines when it matured. The war certainly ended by June, 1865. The protest and notice on the 20th February, 1866, was not sufficient to charge the indorser. 19 La. Ann. R. 43, 63, 156. If the holder was excused from making protest and demand until after the President's proclamation of April 2, 1866, it must have been because she was not entitled to payment; and if that be so, the presentment and protest were premature.

ROBINSON & WALKER, contra. — War dispenses with the necessity of protest and notice. 1 Parsons on Notes & Bills, 460; Story on Prom. Notes, §§ 257–62; Story on Bills, § 308; Byles on Bills, 236, n. 2; Apperson v. Union Bank, 4 Cold. (Tenn.) 445; Polk v. Spinks, 5 Ib. 431. It is sufficient if notice be given within a reasonable time after peace. Hopkirk v. Page, 2 Brock. 20, and authorities supra. The war did not close, as to Alabama and Louisiana, until April 2, 1866. The Protector, 12 Wallace, 700. Protest might have been delayed until that time, without legal laches.

PETERS, C. J. — The record shows that one of the bills of exchange, which was dated May 4, 1860, and payable in thirteen months after date, fell due on the 5th day of June, 1861; and the other, which was dated May 29, 1861, and payable in twelve months after date, fell due on the 30th day of May, 1862. They were each made in this State, and payable in New Orleans, in the State of Louisiana. They were, therefore, foreign bills of exchange. Todd v. Neal's Adm'r, at the last term. And Turner was only liable as indorser on the same. A party so situated is discharged, unless the bills are duly presented to the drawees, at maturity, for payment, and upon a demand for payment, when payment is refused, the bills

[Turner's Administrator *v*. Patton.]

are duly protested for non-payment, as required by the law of the place of payment, and due notice of such protest is given to the indorser, who it is intended shall remain bound to pay the bills. *Todd* v. *Neal's Adm'r, supra ; Donegan & Tabor* v. *Wood,* at the last term, and cases there cited. By the general law-merchant of this country, such instruments are entitled to the customary days of grace, before they can be protested for non-payment. Usually this is until the third day after the paper falls due. 3 Kent, pp. 100, 102 ; Story on Bills, §§ 332, 333, 334, and notes ; 1 Parsons on Notes & Bills, pp. 389, 390, and notes. Yet this general law has some exceptions, which excuse the holder, when the circumstances are such as prevent a compliance with its demands. Judge Story states the rule, in such cases, as follows : " But although, in general, a protest on the part of the holder is essential, upon the dishonor of a bill of exchange, to found a right of action against the drawer or any prior indorser ; yet there are circumstances which may excuse or justify the want of such protest. Thus, for example, if the protest is prevented from being made in due season, or made at all, by any inevitable accident or casualty, or by superior force, that will excuse or justify the omission or want." Story on Bills of Exchange, § 280 ; also Chitty on Bills, pp. 360, 366 ; Bayley on Bills, pp. 294, 395 ; 1 Parsons on Notes & Bills, pp. 531, 532 ; Story on Promissory Notes, §§ 259–263. Here it does not appear that Mrs. Patton was hindered by any superior force to demand payment of the bills of exchange in question several months before this was done. She was not an inhabitant of a state or country at war with the State of Louisiana during the late Rebellion, nor would she have been forbidden, as a loyal citizen, at any time, by the government of the United States, to have visited the city of New Orleans to attend to her necessary business, upon securing a proper permit to do so ; nor is it shown that as soon as the Rebellion was suppressed, she took occasion to have her bills properly protested, and to give due notice of the protest to Turner, the indorser. It is known to the court, as a matter of the public history of the nation, that the late insurrection in the seceding states, under the authority of the Confederate government so called, was totally suppressed, and the insurgent forces all surrendered, before the first day of June, 1865. General Lee surrendered the rebel forces in Virginia, on the 9th day of April, 1865 ; General Johnson, during the same month, surrendered all the insurrectionary troops " east of the Chattahoochee River ; " on the 4th day of May following, General Dick Taylor surrendered all the remaining rebel forces " east of the Mississippi River ; " on the 10th day of May, 1865, Jefferson Davis, the President of the so-called Confederate government, with such

of his cabinet as had not abandoned him and absconded, was arrested, by the United States troops, in the State of Georgia; and on the 29th day of May, 1865, General Kirby Smith gave up the cause of the insurrection by surrendering the forces under his command west of the Mississippi River. This ended all actual military opposition to the government of the United States. 2 Harper's Hist. of the Great Rebellion, ch. 57, 58, 59. This also appears from the President's annual message to the Congress of the United States, of the 4th of December, 1865. In this document he says, " The United States had recovered possession of their ports and arsenals, and their armies were in the occupation of every state which had attempted to secede." . . . . " On this principle I have acted, and have gradually and quietly, and by almost imperceptible steps, sought to restore the rightful energy of the general government and of the states. To that end, provisional governors have been appointed for the states, conventions called, governors elected, legislatures assembled, and senators and representatives chosen to the Congress of the United States. At the same time, the courts of the United States, as far as could be done, have been reopened, so that the laws of the United States may be enforced through their agency. The blockade has been removed, and the custom-houses reëstablished in ports of entry, so that the revenue of the United States may be collected. The Post-office Department renews its ceaseless activity, and the general government is thereby enabled to communicate promptly with its officers and agents. The courts bring security to persons and property; the opening of the ports invites the restoration of industry and commerce; the post-office renews the facilities of social intercourse and of business." Message and Docs. 1865, p.    . And the President, in his message to Congress of the 18th December, 1865, in reply to a resolution of that body, declares " that the Rebellion waged by a portion of the people against the properly constituted authorities of the government of the United States had been suppressed; that the United States are in possession of every state in which the insurrection existed; and that, as far as could be done, the courts of the United States had been restored, and post-offices reestablished." President Johnson's Message, Dec. 18, 1865; M'Pherson's Political Manual, 1866, p. 66. These documents contain a portion of the authoritative history of the nation. They are official executive acts, and the courts are bound to notice them. 1 Greenl. Ev. § 5; 13 Pet. 519, 590; 1 Stark. Ev. pp. 507–509. There was, then, no war existing in the State of Alabama, or the State of Louisiana, after the 18th day of December, 1865, which prevented social or commercial intercourse between the inhabitants of these states. Besides, the courts will take notice of the post-roads and post-offices

[Turner's Administrator *v*. Patton.]

of the United States. They are established by a law of Congress, and this the courts must notice. Const. U. S. Art. I. § 8, cl. 7; 1 Cranch, 137. And where the memory of the judge is at fault, he may resort to such official documents as may be within his reach to aid him in fixing a historical fact. This court, then, will take notice that the regular mails between New Orleans and Huntsville were reëstablished, and in successful operation, before the 18th day of December, 1865. This was above two months before the protest, and the sending the notice by mail in this case, as shown by the bill of exceptions. Under the circumstances, this was not sufficient diligence to bind the indorser.

The facts disclosed by the record, and which the court could infer from the condition of the country, did not justify the long delay after the suppression of the Rebellion, as shown by President Johnson's communication to Congress on the 18th day of December, 1865, to make the demand of payment of the bills of exchange claimed by Mrs. Patton, their protest and notice of protest to Turner, the indorser. His estate was discharged by the delay, which was without sufficient excuse. The proclamation of the 2d of April, 1866, by which the President made known that the Rebellion was ended, did not, and could not, alter his previous declaration to Congress, in his official communications to that body, that the Rebellion was suppressed and the mails restored. These communications were official, and they were required by the Constitution. Const. U. S. Art. II. § 3. The President's proclamation, of the 2d April, 1866, above referred to, cannot be permitted to govern the rights of the parties in such a case as this, and probably many others of like character, and to keep the country under the disabilities and penalties of a state of war long after all belligerent operations have ceased, and the public enemy is utterly routed and driven from the field. The opinion in the case of *The Protector* was not intended to reach this phase of this question, or to contradict and ignore the well-known history of the country, civil and commercial, and it must be confined to its legitimate limits. 12 Wall. 700.

Doubtless, the records of the Post-office Department will show the exact stage at which the mails were restored in the states engaged in the late insurrection against the Union. And it will be much safer to rely on these records, than to resort to *criteria* which lead to a wide departure from the true circumstances of the case, and the true history of the nation.

The judgment of the court below is reversed, and the cause is remanded.

BRICKELL, J., not sitting.