## In Equity.

J. Melvin Bartlett, Petitioner, *vs.* Bertrand G. McIntire.

## Oxford.    Opinion March 23, 1911.

*Elections.   Recount.   Review.   Australian Ballot Law.   Construction.   Marking
Ballots.   Distinguishing Marks.   Misspelled Names.   Incomplete Names.
Mutilated Ballots.   Statutes, 1891, chapter 102, sections 10, 24;
1893, chapter 267.   Revised Statutes, 1883, chapter 4, sections
29, 63; 1903, chapter 6, sections 1, 24, 43, 70-74.*

In a proceeding under Revised Statutes, chapter 6, sections 70-74, for an election recount, an appeal from a decision of a single Justice is triable de novo; his finding not having the same force as in appeals in equity.

The requirements of Australian ballot law, Revised Statutes, chapter 6, concerning voting should be interpreted broadly and reasonably.

Under Revised Statutes, chapter 6, section 24, requiring a ballot to be prepared by marking a cross in the appropriate margin or place, a ballot is invalidated if all the squares are vacant; if there is a cross in two or more; if a design other than a cross, as a circle, a square, an arrow, a single line, is used.

The question whether a mark on a ballot constitutes a cross within the requirements of Revised Statutes, chapter 6, section 24, is a question of fact to be determined by the tribunal having ultimate authority to count ballots.

Mathematical precision in marking a ballot is not required, and the crosses required by Revised Statutes, chapter 6, section 24, may be of any size, may be made by ink, pencil, and of any color, and a ballot is not invalidated because made by a stub of broken lead, because the lines have been inadvertently extended beyond the square, nor because of the extra lines produced in retracing the lines of a cross.

Revised Statutes, chapter 6, section 43, providing that no ballot shall be received at any election of state or town officers, unless on clean white paper, without any distinguishing marks, but that no vote shall be rejected on account of such marks after it has been received into the ballot box, applies only to the outside of official ballots and to common or open ballots, and does not apply to distinguishing marks on the inside of folded Australian ballots, which cannot be seen by the election officers.

Before a ballot should be rejected on account of a distinguishing mark, it should appear that the mark is such as to distinguish the ballot from others, and that it was made intentionally as a distinguishing mark.

What constitutes a distinguishing mark on a ballot is to be determined by the tribunal whose duty it is to count the ballots.

The rule of idem sonans must be applied to misspelled names on a ballot.

Where the check lists of a county do not contain the name of any other "B. G. McIntire" than a particular candidate, all ballots for "B. G. McIntire" should be counted, and all ballots on which are broken stickers on which appear "rtrand G. McIntire," "trand G. McIntire" should be counted; but ballots containing merely "McIntire" or "Bernecd McIntire" should be rejected.

Under Revised Statutes, chapter 6, section 24, requiring a ballot to be marked by a cross, a ballot is not invalidated by the marking of a cross of irregular shape caused by clumsiness, inadvertence, failing sight, trembling, uneven surface, or other similar cause: e. g., an incomplete cross made by one straight line joined by another at right angles; a mark resembling the figure four, often used in algebra and formed at one stroke; a partial or entire double cross, evidently resulting from an attempt to retrace a cross with a third line partially or wholly crossing it, if evidently made as part of the cross; trifling marks evidently made by accident while making a cross mark; nor by a cross made and erased and another made in the same square.

Under Revised Statutes, chapter 6, section 24, requiring a ballot to be marked by cross, one marked by a star, by hieroglyphics resembling nothing, or by a check mark, or by a straight line must be rejected.

Ballots were not invalidated, as bearing distinguishing marks, by placing a cross opposite or a sticker over the name of a candidate for another office, either in the column below the crossed square or in another column; marking a cross under or on either side of the name of a candidate for an office in a column and erasing the name of a candidate for another office in the column voted and placing a cross below the name of the candidate for the same office in another column, erasing such name, writing below the name of the desired candidate, and also erasing this latter name in the other column, placing the cross against the names of one or more candidates in some column where the party square is crossed.

Ballots were *held* invalidated as bearing distinguishing marks by marking two or more distinct crosses in the same square, with no evidence of retracing, by clearly discernible crosses in more than one square, though one of them be partially erased, and by cutting out the name of a candidate for another office.

Mutilated ballots should not be counted.

A ballot is invalidated where the designation of an office is either erased or covered by a sticker; but when a sticker is so placed that enough of the designation remains to see what the office was the vote should be counted.

A ballot must be rejected where, in attempting to vote a split ticket, the voter did not follow either of the statutory methods and failed to erase or

cover the name of one candidate, thereby leaving the names of two candidates for one office.

*Curran* v. *Clayton*, 86 Maine, 42, and *Durgin* v. *Curran*, 106 Maine, 509, overruled in so far as in conflict with the case at bar.

In equity.   On appeal by defendant.   Petition sustained.

Proceedings by the plaintiff "as in equity," under the provisions of Revised Statutes, chapter 6, sections 70 to 74, to determine his right to the office of sheriff of the county of Oxford.   An answer was filed by the defendant.   The matter was heard by the Justice of the first instance who found and decreed that the plaintiff was entitled by law to the said office of sheriff.   Thereupon the defendant appealed as provided by section 72 of said chapter.

The case is stated in the opinion.

NOTE.   Section 27 of chapter 6 of the Revised Statutes, was amended by the Public Laws of 1911, chapter 72, so that said section 27 as amended now reads as follows :

"Section 27.   If a voter marks more names for any one office than there are persons to be elected to such office, or if for any reason it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for such office.   No ballot without the official indorsement shall, except as herein otherwise provided, be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this chapter shall be counted.   Ballots not counted shall be marked defective on the back thereof, and shall be preserved, as required by section twenty-five.   No marks, other than those authorized by law, shall be placed upon the ballot by the voter, but no ballot, after having been received by the election officers, shall be rejected as defective because of marks other than those authorized by law, having been placed upon it by the voter, unless such marks are deemed to have been made with fraudulent intent, and no ballot shall be rejected as defective because of any irregularity in the form of the cross in the square at the head of the party column unless such irregularity is deemed to have been intentional and made with a fraudulent purpose."

*Albert J. Stearns*, and *Jesse M. Libby*, for plaintiff.

*Kimball & Son*, and *McGillicuddy & Morey*, for defendant.

SITTING:  EMERY, C. J., WHITEHOUSE, PEABODY, CORNISH, KING, BIRD, JJ.

CORNISH, J.   At the State election held on September 12, 1910, the parties to this proceeding were opposing candidates for the office of sheriff of Oxford county, and their names were printed on the official ballot.

By the official returns to the secretary of State it appeared that the petitioner Bartlett had received 3,707 ballots and the defendant McIntire 3716 ballots.   The Governor and Council therefore issued a certificate of election to Mr. McIntire, who entered upon the discharge of his official duties on January 1, 1911, and is still in office.

The petitioner afterwards filed a petition in the Supreme Judicial Court for Oxford county, asking that a single Justice make a recount as provided in R. S., ch. 6, sects. 70-74.   After due notice and hearing and upon inspection of the ballots, the single Justice found that the total number of legal ballots cast for the petitioner was 3,660, for the respondent 3,657, that the petitioner had received a plurality of all the ballots cast for sheriff and was therefore entitled by law to the office claimed by him.

The case is now before the appellate Justices on the appeal of the respondent from this judgment of the single Justice.

1.   *Legal Effect of Appeal.*

The first question to be decided is the effect of the findings of the single Justice upon questions of fact on appeal.   Do such findings have the same force as in appeals in equity, that is, reversible only when clearly wrong, *Young* v. *Witham*, 75 Maine, 536 ; *Paul* v. *Frye*, 80 Maine, 26 ; *Jameson* v. *Emerson*, 82 Maine, 359 ; or does the appeal vacate the proceedings below and transfer the case, as in probate proceedings, so that the appellate Justices are to determine all questions de novo ?   The procedure is somewhat anomalous.   It is true that section 70 of chapter 6 provides that the claimant "may proceed as in equity" by petition returnable before any Justice of the Supreme Judicial Court but it does not say that he shall bring a bill in equity, and the subsequent proceedings bear slight resemblance to those required by the equity rules.   Moreover section 72

provides that an appeal from the decision of the single Justice shall set forth the reasons therefor.    This is not required in an appeal in equity, but is, in probate appeals; and the appeal itself is taken, not to the Law Court as such, but to the Justices.    A careful consideration of the entire statute and its object leads to the conclusion that the purpose of the Legislature in providing for an appeal, was to obtain the decision of the appellate Justices de novo upon all disputed questions both of law and fact, and the clause in the statute providing that the claimant "may proceed as in equity" was used merely in contradistinction to proceedings on the law side of the court, with its stated terms and more rigid rules of procedure.

The sole question at issue therefore is what ballots should now be counted for Mr. Bartlett and what for Mr. McIntire.    Such decision must follow a correct count made under the rules of law and the statutes of this State.

2.    *Requirements of the Australian Ballot Law.*

The Australian ballot was adopted in this State by chapter 102 of the Pub. Laws of 1901, and has therefore been in use for a period of twenty years.    Under this original Act the ballots were so printed as to leave a blank space at the right of the name of the party designation, and also at the right of the name of each candidate, and the voter was permitted to place a cross (✕) opposite the name of the party designation, if he wished to vote for all the candidates named in the group under such designation, or to place such mark opposite the names of the individual candidates of his choice for each office to be filled, or to fill in the name of the candidate of his choice in the blank space provided therefor and place the mark opposite, in which cases he was deemed to have voted only for the individual candidates opposite whose names he had placed the mark.    Pub. Laws, 1891, ch. 102, sects. 10 and 24.

This was amended by chap. 267 of the Pub. Laws of 1893, so as to require a square to be placed above each party designation and group, and a blank space to be left after the names of the candidates. The voter is thereby allowed to place the cross within the square if he wishes to vote the entire party ticket; or to erase any printed name or names and under the name or names so erased to fill in the

name or names of his choice.   Or if he does not desire to vote for a person whose name is printed on the party ticket he may erase such name and the ballot shall not be counted for such person.

In 1903, a further amendment was enacted whereby the voter was permitted to place and stick on and over the name of any candidate a sticker, bearing thereon the name of the person of his choice.   These three acts taken together make up the present Australian ballot law as found in Rev. St., chap. 6.

3.   *Its objects.*

The objects of this law are universally recognized to be twofold, the securing of a secret ballot and the prevention of bribery and corruption at the polls.   It was not intended to limit or defeat the sacred right of franchise by establishing a method so intricate or complicated as to circumvent the intention of the honest voter. That intention must of course be expressed in compliance with statutory requirements but those requirements are to be interpreted broadly and reasonably.   Sec. 27 provides that "if for any reason, it is impossible to determine the voter's choice for an office to be filled, his ballot shall not be counted for that office."   If the converse of this be thereby implied, namely, that all ballots shall be counted where it is possible to determine the voter's choice, a wide latitude would be given to the canvasser.   However it must be a legally expressed choice with presumptions in favor of the voter rather than against him.

The difficulty in counting ballots under the Australian system, as it exists in this State, arises for the most part not on the point whether a certain ballot is to be counted for the one candidate or for the other but whether it is to be counted at all or rejected; if it is to be counted there is usually no doubt as to the candidate for whom it should be counted.

Moreover the alleged defects to be considered naturally group themselves in two classes, those where the voter has not complied with the statutory requirement as to marking or changing his ballot, and those that bear distinguishing marks.

We will take these up in their order.

4. *Violation of Statutory Requirements.*

R. S., chap. 6, sec. 24, provides that the voter "shall prepare his ballot by marking in the appropriate margin or place, a cross ($\times$) as follows." Then follows the direction already referred to. These words of the statute do not fit present conditions. They applied to the original statute of 1891, where directions were given for marking in the margin, both opposite the name of the party designation and opposite the names of individual candidates. But the amendment of 1893 rendered them inapplicable in part because since that amendment, marking in the margin is no longer recognized as a legal method, and the only marking now permissible, in order to legally indicate a choice, must be in the square at the head of the party group. Not that marking in the margin opposite a candidate's name necessarily invalidates a ballot, but that alone cannot validate one because it is not a compliance with the statute requirement. In other words the marking must be as the statute commands in a particular place and by a particular emblem. Therefore an entire ballot must be rejected for all candidates if there is no cross whatever in a square, or if the mark, though in a square, cannot fairly be construed to be a cross. To illustrate : A ballot with all the squares vacant must be rejected ; a ballot with a cross in two or more squares must be rejected ; a ballot with some other design, as a circle or a square or an arrow or one line must be rejected. The Legislature has the right to prescribe the manner of marking and the voter must follow it if he wishes his vote to be counted. This well illustrates what is meant by intention legally expressed. It might be said with much force that the intention of the voter is as apparent when he places a circle as when he places a cross in the square, but the intention is not expressed as the statute demands and therefore such a ballot would be fatally defective.

When however we come to the question of whether the marks placed in the square amount to a cross and meet the statutory requirement, a question of fact is raised which must be determined by the tribunal vested with the ultimate authority to count the ballots. Each ballot must be tested by an honest judgment upon an inspection of the ballot itself and mathematical precision in the

marking cannot be required or expected. Therefore crosses may be made of any size within the square; they may be made by ink or by a pencil mark of any color or even by the stub of a broken lead; the lines may have been extended inadvertently beyond the squares and in retracing the lines of a cross extra lines may appear. All the countless variations must be referred to the one paramount requirement of what answers to a cross in the square.

5. *Distinguishing Marks.*

The last paragraph brings us to the question of distinguishing marks, their nature and effect.

Prior to the adoption of the Australian ballot system, there were no official ballots in this State. At that time the statutes contained this provision which seemed to cover all the requirements under the old system.

"No ballot shall be received at any election of State or town officers, unless in writing or printing upon clean white paper without any distinguishing marks or figures thereon, besides the names of the persons to be voted for and the offices to be filled; but no vote shall be rejected on this account after it has been received into the ballot box." R. S., 1883, ch. 4, sec. 29. R. S., 1883, ch. 4, sec. 63, imposed a penalty upon municipal officers who wilfully received any vote prohibited by the foregoing section.

It is common knowledge that under the old system each political party had its separate ballot consisting of a single sheet on which the names were printed or written. The voter was required to present this ballot to the officers in charge of the box, in such a manner that they could see whether or not it bore any distinguishing marks. The officers were thereby made judges "of what constituted a ballot with distinguishing marks, under a severe penalty in case of an intentional and erroneous decision. The section authorized them to decide what constituted a distinguishing mark. There may have been many marks upon the ballot which may or may not have been distinguishing; the voter may have presented it in good faith and, as such, it may have been received by the town officers, which on subsequent inspection may be determined otherwise and so certified. But the same was received without objection, whereas,

had objection been made before the vote was cast another vote could easily have been substituted and most assuredly would have been, if the voter had been apprised of its illegality by the presiding officers." Opinion of Cutting, J., 54 Maine, 605.

When the Australian ballot law was passed in 1891, no change whatever was made in R. S., 1883, ch. 4, section 29, and no single act has since been passed by the Legislature in terms amending that section. But in the general revision of 1903, the words "the official endorsement" were inserted after the word "besides" by the reviser and, as thus changed, the entire section was reenacted together with all the other general statutes and became sec. 43 of chap. 6, of our present statutes. As it now stands the section reads : "no ballot shall be received at any election of State or town officers, unless in writing or printing upon clean white paper without any distinguishing marks or figures thereon, besides the official endorsement, the names of the persons to be voted for and the offices to be filled; but no vote shall be rejected on this account after it has been received into the ballot box." If the last clause could be read by itself it would seem to compel the counting of all ballots after they have been received into the ballot box whether they have certain distinguishing marks or not. On the other hand when we consider that the Australian ballot is, in fact as well as in name, a secret ballot, that the voter is required to fold it, so that neither the election officers nor any one else can see the face of the ballot, nor the marks thereon, and that a penalty is imposed upon the voter who shall "allow his ballot to be seen by any person with an apparent intention of letting it be known how he is about to vote," sec. 29, it would seem that section 43 and the Australian system are so inconsistent that they cannot stand together and that as the intent of the Legislature to provide a secret ballot was paramount, sec. 43 might be regarded as repealed by necessary implication and that its retention in the revision was not the real Legislative intent, as was said in *Durgin* v. *Curran,* 106 Maine, 509, 77 At. 689.

We do not think, however, that it is necessary to go to either of these extremes and hold either that distinguishing marks can no longer invalidate a ballot, or that section 43 has no longer

any legal force. Another interpretation, midway between these extremes, reconciles both contentions and effectuates the legislative intent.

The Australian ballot law applies only to elections for national, state, district and county officers in cities, towns and plantations and in municipal elections in cities. R. S., ch. 6, sec. 1. It has no application whatever to municipal elections in towns and plantations. Therefore sec. 29 of chap. 4 of the R. S. of 1883, continued to apply to municipal elections in all the five hundred towns and plantations of this State with the same effect after the Australian ballot law was passed as before, and it still is in full force and virtue as to them. It did not and could not, from the very nature of the case, affect the Australian ballot until the revision of 1903, when the provision was inserted whereby election officers were given the same power over the outside of the Australian ballot as over the face of the open ballot. The outside of the Australian ballot must bear the official endorsement and the statute now forbids any distinguishing marks or figures on the Australian ballot "beside the official endorsement." In other words the outside of the Australian ballot and the entire open ballot are both subject to the inspection of the election officers. If either bears what they deem to be distinguishing marks, it can and should be rejected, and the voter should be allowed to take another ballot, but once received into the ballot box it must be counted, so far as marks so placed are concerned. The inside of the secret ballot, however, is still kept secret. The election officers cannot know what marks or figures that may bear until opened and inspected after the polls are closed. And if that is found to contain distinguishing marks it certainly cannot be counted. The fact that it has been received into the ballot box cannot make it countable under section 43, and to hold that no distinguishing mark can invalidate it utterly destroys one of the prime objects of the system. *Curran* v. *Clayton*, 86 Maine, 42. If the purchasable voter can still intentionally place such identifying marks upon his ballot, that it can be recognized as his and yet it must be counted, the law is virtually dead for the spirit has left the body.

The next inquiry is, what shall be deemed such a distinguishing mark as will invalidate a ballot. This is an important question, for upon its answer depends, in many cases, the disfranchisement of a qualified and honest voter.

After a careful consideration of the subject in view of the purpose of the law and the sacredness of the right of franchise, we are of opinion that before a ballot is rejected because of an alleged distinguishing mark, we should be satisfied from an inspection of the ballot itself, which is the only evidence before us, of three things :

First, that the mark is in fact a distinguishing mark, that is a mark or device of such a character as to distinguish this ballot from others.

Second, that it was made intentionally and not accidentally.

Third, that it was intended to be a distinguishing mark. In other words we think no ballot should be rejected on the ground of bearing a distinguishing mark unless it is such a one as fairly imports, upon its face, design and a dishonest purpose.

A mark upon a ballot may be a distinguishing mark in fact, and yet be of such a character as to show that it was accidentally made, or even that it was intentionally made, but for some other purpose than a distinguishing mark, because a distinguishing mark in fact is not necessarily a distinguishing mark in law. For instance, a voter may make a cross in a party square, then erase the name of the county attorney in that party group, and place a cross opposite the name of the candidate for county attorney in another party group. Here the voter made a distinguishing mark, he did it intentionally, but he did not do it with an intention to make it a distinguishing mark, that is with a dishonest purpose. His intention is clear. He wished to vote for the candidate of another party for county attorney instead of his own. His purpose failed and his vote for that office cannot be counted because he did not follow the statutory method of voting a split ticket, but that does not invalidate his whole ballot. He should not be disfranchised as to other candidates when he has followed the statutory directions as to them.

But if a voter has placed such a mark or device or name or initials or figures upon the ballot as seem inconsistent with an honest purpose, such a ballot should be rejected.

We are aware that this is a somewhat narrower rule of exclusion and therefore a somewhat broader rule of inclusion than has been announced by this court hitherto, and in so far as the directions for marking and the rules of rejection contained in *Curran* v. *Clayton*, 86 Maine, 42, and *Durgin* v. *Curran*, 106 Maine, 509, 77 At. 689, are in conflict with this opinion, they are overruled.

What constitutes a distinguishing mark is therefore a question of fact to be determined by the tribunal whose duty it is to count the ballots, but under the broad and liberal rules herein adopted it will be found that few fall within the ban.

6.   *Misspelled or Incomplete Names.*

In the case of misspelled names written in the ballot, the familiar rule of idem sonans must be applied.

In the case of incomplete names it was admitted in this case that there is not the name of any McIntire on any of the check lists in the county of Oxford whose initials are "B. G." except that of Bertrand G. McIntire the respondent, and therefore all ballots for B. G. McIntire should be counted.   Also all ballots on which were broken stickers on which appear "rtrand G. McIntire," "trand G. McIntire" "rand G. McIntire" and Bertrand McIntire are counted, but ballots containing the single word "McIntire" or "Bernecd McIntire" are rejected.

The books are full of election cases that have arisen in the various States.   These differ greatly, the difference being due partly to the peculiar statutes in the several States and partly to the views of the particular court construing those statutes.   The case of *Hope* v. *Flentge*, 140 Mo. 390, reported in 47 L. R. A. 806, with a full and interesting note shows the wide variety of questions that have arisen in other jurisdictions together with the rulings of the various courts thereon.

We have not, however, deemed it profitable or practicable to glean from these authorities those that may sustain the conclusions we have reached, nor to distinguish those holding in some respects a contrary view.   We are attempting to place a reasonable construction upon our own statute and to evolve workable rules for the conduct of our own elections.

7.   With these general rules as guides we will proceed to consider the ballots in this case.

The whole number of ballots purporting to be cast for sheriff was 7,648.   Of these the parties agreed that 3,403 should be counted for Bartlett and 3,320 for McIntire.   They also agreed that 203 ballots, for various reasons were defective and should not be counted at all, leaving 6,723 undisputed and 722 in dispute, a total of 7,445.   All of these disputed ballots have been examined singly by the appellate Justices sitting together, and they have been each counted or rejected in accordance with the rules and principles already stated which were agreed upon before the counting began.

It is of course impracticable with the limits of this opinion to call attention to each individual ballot counted or rejected.   We can do no more than to refer to them in groups as they somewhat naturally arrange themselves.

(1.)   Cross in the Square Counted.

Under this head are included those ballots where the cross in the square is of irregular shape, caused by clumsiness, inadvertence, accident, failing sight, old age, trembling hand, an uneven board beneath the ballot, or any other similar cause.   Thus an incomplete cross made by one straight line joined by another at right angles; a mark resembling the figure 4, often used in algebra and formed at one stroke; a partial or entire double cross, the evident result of an attempt to retrace lines composing a cross; a cross with a third line partially or wholly crossing it, where the extra line is evidently made as a part of the cross; trifling marks evidently made by accident while making the cross mark; a cross made and erased, and another made in the same square; a cross made with ink, lead pencil of any color and the stub of a pencil whose lead was broken. None of these nor like departures or variations should invalidate a ballot.   Even the statute itself has not been uniform in its illustration of the design, for the original act of 1891 prescribed the capital X while the mark when transferred to the Revised Statutes was changed to two single light lines, thus ($\times$) and that without any special enactment.

(2.)    Marks in Squares Rejected.

Considerable latitude in favor of the voter should be given in all these deviations from the exact cross and that this has been done is evident from the fact that out of the whole number of over seven thousand ballots cast and of the 722 in dispute we reject only nine for insufficient cross in the square. These include ballots with no mark whatever in the square, ballots marked with a star, with hieroglyphics resembling nothing, with a check mark, with a straight line.

(3.)    Ballots counted though with alleged distinguishing marks.

These are illustrations: placing a cross opposite or a sticker on or over the name of some candidate for another office either in the column below the crossed square or in another column ; making a cross in a square, then erasing it and making another in the same square ; a cross under or on either side of the name of a candidate for any office in any column ; erasing the name of a candidate for another office in the column voted and placing a cross below the name of the candidate for the same office in another column ; erasing such name, writing below it the name of the desired candidate and also erasing this latter name in the other column ; placing a cross against names of one or more candidates in the same column where the party square is crossed. In these and similar cases where it is clear that no legally distinguishing mark was intended and that there was an ineffectual attempt to vote a split ticket on some other candidates, the ballots have been counted.

(4.)    Ballots rejected because of distinguishing marks.

Only ten ballots fall within this list, and some of these might perhaps be considered as defective because violating the law as to marking in the square. Instances of these defective ballots are : two or more separate and equally distinct crosses in the same square, with no evidence of retracing ; ten crosses in one square; eleven crosses in one square ; clearly discernible crosses in more than one square although there may have been a partial attempt to erase one : mutilations by cutting out the name of a candidate for another office. Mutilated ballots should not be counted.

(5.)   Ballots rejected because the designation of the office was either erased or covered by a sticker.

The designation of office is an indispensable part of any ballot. There must be an office to be filled as well as a candidate to fill it, and if a sticker entirely covers the designation of office, or if the designation be erased, the ballot cannot be counted.   But when a sticker is so placed that enough of the top parts of the letters of the designation remain so that the eye can see what the office was the vote should be counted.

Four ballots were rejected on this ground.

(6.)   Ballots rejected because of two names for same office.

Six ballots are rejected because in attempting to vote a split ticket the voter did not follow either of the methods prescribed by the statute and failed to erase or cover the name of one candidate, thereby leaving the names of two candidates for the one office of sheriff.

(7.)   Names misspelled or incomplete.

Two ballots are rejected because the rule as to misspelled or incomplete names was not complied with, one ballot bearing the name "Bernecd McIntire" and the other simply "McIntire."

This accounts for all the 31 ballots rejected.

Our conclusion therefore is, as follows:

| | | | |
|---|---|---|---|
| Number of ballots rejected, | | | 31 |
| Number of ballots for J. Melvin Bartlett, | | | |
| | Undisputed, | 3403. | |
| | Of the disputed, | 307. | |
| | Total | | 3710. |
| Number of ballots for Bertrand G. McIntire, | | | |
| | Undisputed | 3320 | |
| | Of the disputed, | 384 | |
| | Total | | 3704. |
| | Bartlett's plurality | 6. | |
| | Total ballots, | | 7445. |

Following the stricter directions as laid down in *Curran* v. *Clayton*, and *Durgin* v. *Curran*, supra, the single Justice properly rejected as defective a much larger number of ballots than have we under the more liberal rules of this opinion. But it is interesting to note that if either rule, whether strict or liberal, is impartially adhered to, the results are approximately the same, because both candidates are likely to lose by the narrower rule or gain by the broader in practically the same proportion.

For instance the count of the 722 disputed ballots by the single Justice was this.

| Bartlett, | 257 | |
| McIntire, | 337 | |
| Defective, | 128 | |
| Total, | | 722 |

The count of the appellate Justices is

| Bartlett, | 307 — gain 50 | |
| McIntire, | 384 — " 47 | |
| Defective, | 31 | |
| Total | | 722 |

So that of the 97 ballots discarded under the stricter rules and counted under the more liberal, one candidate gained 50 and the other 47, and this gain of three has increased Bartlett's plurality from three as found by the single Justice to six as found by us.

It is therefore unanimously held that the petitioner having received a plurality of all the ballots cast for sheriff of Oxford county at the State election held on September 12, 1910, was duly elected sheriff of said county for the term beginning January 1, 1911, and is entitled by law to said office now claimed by him.

*Petition sustained with costs.*